MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

W. DOUGLAS SPRAGUE (CABN 202121)
Assistant United States Attorney
   450 Golden Gate Ave., Box 36055
   San Francisco, California 94102
   Telephone: (415) 436-7200
   Fax: (415) 436-7234
   E-Mail: doug.sprague@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 11-0404 WHA |
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM |
| v. | |
| TAMARA LANZ MOON, | Date: March 6, 2012<br>Time: 2:00 p.m. |
| Defendant. | Honorable William H. Alsup |

For approximately five years, defendant, a licensed professional, executed a scheme to defraud her clients out of more than $800,000. She did so right under the noses of colleagues who trusted her, and she was motivated not by desperation, but by greed. Defendant, however, quickly accepted responsibility for her actions, including already making restitution payments in excess of $375,000. For the reasons set forth below, the government respectfully requests that this Court sentence defendant to 33 months imprisonment, three years of supervised release, restitution of $416,770.27, no fine, and the mandatory special assessment of $600.

I.  <u>The Offense Conduct</u>

From approximately 1996 until she was fired in March 2008, defendant was a sales assistant at Smith Barney, a division of Citigroup Global Markets, Inc. (Citigroup). Defendant

worked in Citigroup's office in Palo Alto, California, and she held both a Series 7 and a Series 63 license from the Financial Industry Regulatory Authority. Those licenses permitted defendant, among other things, to sell securities. Defendant's duties included executing trades for brokers, and she handled most of the paperwork related to these trades for certain clients.

From approximately 2003 through March 2008, defendant abused her position to steal more than $800,000 from more than 20 of Citigroup's clients. To do so, defendant falsified client account records, forged client signatures, and made unauthorized trades in client accounts. Defendant used the proceeds of her scheme for her own personal benefit, including to remodel her home, to pay mortgages for other residences she owned, and to make investments in real estate.

One of the clients defendant defrauded was victim R.F. R.F. was an American diplomat living overseas, and he held custodial accounts at Citigroup for his two daughters. Defendant forged R.F.'s signature on fraudulent letters of authorization that purportedly reflected R.F.'s requests to change the address to which his account statements were mailed. Defendant changed the address to her address so R.F. would not be able to monitor account activity. Defendant then sold bonds in one of R.F.'s custodial accounts without authorization, and then she created and submitted a fraudulent letter of authorization to Citigroup requesting that Citigroup issue three checks, totaling more than $32,000, made payable to one of defendant's personal bank accounts. Citigroup did so, and Citigroup mailed the checks to the address defendant had caused to be R.F.'s account address on file: defendant's home address. Subsequently, and again without authorization, defendant sold bonds in the other custodial account R.F. held at Citigroup. Defendant again submitted a fraudulent letter of authorization to Citigroup, causing Citigroup to send another $23,000 of R.F.'s money to defendant at her home address.

Defendant also defrauded victim A.L. On or about February 10, 2006, without authorization, defendant created and submitted a fraudulent "Individual Retirement Account Distribution Request" instructing Citigroup to distribute A.L.'s retirement account to a certain Citbank account number. The recipient account was defendant's personal home equity line of credit. As a result, on or about February 17, 2006, Citigroup issued a check in the amount of

$37,691.17 payable to defendant's home equity line of credit.  On or about March 3, 2006, defendant withdrew $37,000 in cash from that account.  Similarly, on or about June 9, 2006, defendant fraudulently caused another transfer of $65,500 to be made from A.L.'s Citigroup account to her personal home equity line of credit.

Another aspect of defendant's scheme is illustrated by how she defrauded client D.S.  In August 2006, without authorization, defendant created an account (number ending in -750) in the name of D.S.  Approximately one week later, again without authorization, defendant created another account (number ending in -751) in the name of defendant's father.  At approximately the same time, defendant created and submitted a fraudulent letter of authorization in which D.S. purportedly requested that Citigroup transfer $150,000 from D.S.'s account (ending in -750) to the account ending in -751; in the fraudulent letter of authorization, defendant falsely claimed that the account ending in -751 belonged to D.S.'s brother.  Defendant subsequently created additional fraudulent letters of authorization causing the transfer of thousands of dollars out of the account ending in -751 to pay down defendant's personal home equity line of credit.

Defendant also caused victim B.B.'s entire Individual Retirement Account (IRA) to be transferred into defendant's personal home equity line of credit account.  On or about January 3, 2007, and on or about April 2, 2007, defendant created and submitted fraudulent IRA distribution requests purporting to reflect B.B.'s instructions to Citigroup to transfer $3,000 (January 2007) and $24,489.53 (April 2007) into a Citibank account.  The Citibank account, however, was defendant's personal home equity line of credit, and victim B.B. never authorized these transfers.

Defendant used many fraudulent means to defraud E.H., another Citigroup client.  For example, on or about January 5, 2007, defendant created a fictitious letter of authorization purporting to reflect that E.H. instructed Citigroup to issue a $1,000 check from E.H.'s account. Defendant forged E.H.'s signature on the letter of authorization, and she had the check made payable to one of her personal accounts.  Later that year, defendant created another fraudulent letter of authorization directing that Citigroup send, via Federal Express, a $25,000 check to victim A.L.  Defendant again forged E.H.'s signature on this letter, and the $25,000 check was, in truth, to repay some of the funds that defendant previously had stolen from victim A.L.'s IRA,

as set forth above. Finally, on or about February 11, 2008, defendant created another fictitious letter of authorization upon which she forged E.H.'s signature. In this letter, defendant instructed Citigroup to send, via Federal Express, a $15,000 check made payable to D.L. Management out of E.H.'s account. D.L. Management was the company that managed properties defendant owned in Louisiana.

In all, over the course of several years, defendant defrauded more than 20 Citigroup clients out of approximately $800,000 until her scheme was discovered and she was fired.

II. The Sentencing Guidelines Calculations

The parties and Probation Officer agree that the Total Offense Level is 22 and that defendant's Criminal History Category is I. The resulting guideline range of imprisonment is 41-51 months.

III. A Sentence of 33 Months Imprisonment is Reasonable and Appropriate

Several factors support a substantial period of incarceration.

First, defendant orchestrated a scheme that lasted several years and only ended because she was caught. This crime was not a one-time lapse in judgment or even a few sporadic lapses in judgment. It was calculated to deceive clients and co-workers, all for defendant's personal enrichment.

Second, defendant fleeced her clients out of a substantial amount of money—$800,000. Only a substantial prison term will deter her and others from concluding that such rewards are worth the risk. Courts have recognized that "white collar crime . . . requires heavy sentences to deter because it is potentially very lucrative." *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.* at 1240.

Third, to execute this scheme, defendant not only defrauded more than 20 clients by

forging their signatures to transfer money to herself, but she committed these acts at work, repeatedly violating the trust of her co-workers who had placed their trust in her and who were working side-by-side with her on a daily basis.

Fourth, defendant's crime was not motivated by the need to make ends meet or to benefit her daughter, who was four years old when defendant began stealing money. Indeed, both defendant and her husband had good jobs at the time. Rather, defendant used her stolen proceeds for extensive remodeling of her home, to invest in other properties with the goal of making more money for herself while risking other people's money, and, apparently, to buy a new SUV.

Fifth, defendant cannot be permitted to escape fair punishment by blaming this conduct on others, as she appears to do in her letter. She blames her father, her husband, "crooked" realtors, and Hurricane Katrina. While some of these may have contributed to certain aspects of her crime, it was defendant alone—a licensed professional—who committed these fraudulent acts over the course of many years. And defendant's fraud began when she was approximately 35 years old, long *after* her mother and allegedly abusive father were divorced and long *after* her mother remarried.

There are, however, several mitigating factors the government has factored into its recommendation for a below-guidelines sentence of imprisonment. When Citigroup confronted defendant with her crimes, she readily admitted them and explained how she committed them. She made partial restitution—more than $350,000—very quickly after being caught and fired. She continued to accept responsibility by pleading guilty fairly quickly in this case. Furthermore, as demonstrated by the many letters of support, defendant has many family members and friends in the Bay Area that are willing to support her during and after any period of incarceration; defendant seems unlikely to reoffend, and these family members and friends, as well as defendant's ex-husband, no doubt will assist in raising defendant's daughter while defendant is incarcerated.

IV. Defendant Should be Ordered to Pay Restitution of $416,770.27

According to Citigroup, defendant caused losses of $875,201.22. Included in Citigroup's calculations, however, are $73,952.76 in interest payments owed to clients from which defendant

1  stole money.  Because interest cannot be included in loss calculations (*see* U.S.S.G. § 2B1.1,
2  Application Note 3(D)), those interest charges must be excluded from loss calculations.  That
3  results in a total loss amount of $801,248.46.  After her scheme was discovered and she was
4  fired, defendant paid restitution to Citigroup of $384,478.19.  She raised those funds by selling
5  her home at a profit ($298,000), liquidating a 401(k) account ($76,095.29), and from funds in a
6  bank account ($10,382.90).  As a result, defendant owes outstanding restitution to Citigroup of
7  $416,770.27.  In light of that outstanding balance, the government recommends defendant not be
8  ordered to pay a fine, even though she has (slightly) positive cash flow and retained counsel.
9  (PSR, ¶ 56.)

10 V.     Conclusion
11        For these reasons, the government respectfully requests that defendant be sentenced to 33
12 months of imprisonment, three years of supervised release, no fine, restitution of $416,770.27,
13 and the mandatory special assessment of $600.

14 DATED: February 28, 2012                    Respectfully submitted,

                                                MELINDA HAAG
                                                United States Attorney


                                                _____/s/_____
                                                W. DOUGLAS SPRAGUE
                                                Assistant United States Attorney